[S. F. No. 19863. In Bank. May 19, 1959.]

TED CHAVEZ, Appellant, v. O. E. SARGENT et al., Respondents.

172

Garvin W. Hale for Appellant.

Severson, Davis & Larson, Nathan R. Berke and George Brunn as Amici Curiae on behalf of Appellant.

Morgan & Beauzay, Robert Morgan and Louis Sherman for Respondents.

Charles P. Scully, Victor Van Bourg, Gladstein, Anderson, Leonard & Sibbett and Norman Leonard as Amici Curiae on behalf of Respondents.

SCHAUER, J.—Plaintiff appeals from a judgment of dismissal entered after a general demurrer to his complaint was sustained and he had declined to amend. By the complaint an employer seeks injunctive relief from activities of defendants, a labor union and its secretary, designed to induce plaintiff to enter into a union shop agreement with defendant union. Both plaintiff and a majority of his employes desire such an agreement, i.e., neither plaintiff nor defendants wish to force

a union shop upon a group of employes whose majority do not freely choose it. But defendants' activities are, and the execution of the contract which such activities are intended to effect would be, contrary to the provisions of a San Benito County "right-to-work" ordinance.

The controlling issues, it will develop, are (1) whether the state by valid law has occupied the field so comprehensively that the ordinance cannot stand, and (2) whether the complaint states a cause of action under state law. To resolve these issues confidently requires examination of the state's statutory law concerning not only the relations between labor and management, as such, but also that which regulates relationships and activities between competing labor organizations and between those organizations and their own members, and the members of other organizations, and unorganized workmen, and the rights, if any, of the individual workmen to participate in the selection of their bargaining agents and in the determination of objectives of collective negotiations and ultimate terms of agreement. The statutory law must be interpreted in the light of the earlier decisions of this court as they, in turn, have been affected by developing law, both statutory and decisional.

By way of circumscription, however, and to preclude misapprehension as to the import of our discussion or holdings, we note that this litigation presents no occasion to, and we do not, consider or undertake to define the extent to which, as between any willing employer and any willing union, the Legislature can validly regulate their respective basic freedoms to voluntarily contract for the services and remunerations of workmen and for other basically lawful objectives of the contracting parties.

We have concluded that: (1) There is no cause of action under the ordinance, for such ordinance is invalid because it contains unseverable provisions which conflict with both the legislatively declared general labor policy of this state and certain specific implementations thereof. (2) No cause of action under the general law of this state is or can be stated because it affirmatively appears that plaintiff and defendants propose to execute a mutually desired, lawful, collective union security agreement arrived at by means which accord with and fully recognize the rights of plaintiff's individual workmen to organize and to participate in the selection of their bargaining agents for the negotiation of such agreement free from employer interference, all in accord with the

overriding state policy declared in Labor Code, section 923, and implementing statutes hereinafter quoted.

The complaint alleges the enactment and terms of the subject ordinance (No. 201). Its provisions are quoted or summarized in the margin.[1] The further substance of the complaint is by no means a model of certainty or clarity. However, the facts directly or inferentially alleged were summarized in the opinion prepared by Presiding Justice Peters (now an associate justice of this court) for the District Court of Appeal before transfer of the cause to this court and as neither party suggests any error in such summary we adopt it (with interpolations of certain further details averred in the complaint) as a correct summary of the pleading.

[ ][2]The complaint alleges that the plaintiff, Ted Chavez, is a painting contractor doing commercial and residential

---

[1]Section 1: ''The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment or other conditions of employment.'' (It should be noted that the definition of ''labor organization'' in this section is for all practical purposes identical in language and meaning with Labor Code section 1117 hereinafter quoted.)

Section 2: ''The word 'person' includes a corporation, association, company, firm or labor organization, as well as a natural person.''

Section 3: ''No person shall be denied the opportunity to obtain or retain employment because of non-membership in a labor organization, nor shall the county, any agency thereof, or any corporation, individual or association of any kind enter into any agreement, written or oral, which excludes any person from employment because of non-membership in a labor organization.''

Section 4: ''Any act or provision in any agreement entered into on or after the effective date hereof or any renewal or extension of any existing agreement entered into on or after the effective date hereof which is in violation of this ordinance shall be illegal and void. Any strike or picketing to force or induce any employer to make an agreement in writing or orally in violation of this ordinance shall be for an illegal purpose.''

Section 5: ''It shall be unlawful for any employee, labor organization, or officer, agent or member thereof to compel or attempt to compel any person to join any labor organization or to strike against his will or to leave his employment by any threatened or actual interference with his person, immediate family, employment or property.''

Section 6: ''Any combination or conspiracy by two or more persons to cause the discharge of any person or to cause him to be denied employment because he is not a member of a labor organization, by inducing or attempting to induce any other person to refuse to work with such person, shall be illegal.''

Section 7 provides that one injured by violation of the ordinance can sue for damages and section 8 provides that such a person can have injunctive relief. Section 9 is a broad separability provision. The ordinance contains no penal provision.

[2]In the adopted paragraph, brackets together, in this manner [], indicate deletions from the statement of the District Court of Appeal;

painting in Santa Clara and San Benito Counties; that a majority of his employees are members of [defendant Painters and Decorators Local Union 1157 AFL-CIO] [ ]; that [defendant] Sargent is the secretary of that union, and that such union is the only painters' union in San Benito County; that the defendants demand that plaintiff sign a union contract similar to the one that he has in Santa Clara County with the painters' union there, providing ["as permitted by the NLRA (Taft-Hartley)"] for union membership after 30 days of employment; that the union members in San Benito County are conspiring to compel the nonunion painters to join the union, and refuse to work with nonunion painters; that these acts are in violation of the ordinance; that plaintiff "wishes to sign a union security contract but is subject to a suit for damages" under the ordinance if he does so. ["That plaintiff will suffer irreparable harm unless the injunction authorized by Ordinance 201 is issued."] Plaintiff therefore prayed for a temporary and permanent injunction compelling the defendant union "to desist from their demands for any type of union security in San Benito County and compelling them to work with non-union building trades employees." [ ] [And as a conclusional summation of the pleading the subject opinion states:] In the instant case the employees want a union shop agreement and the employer wants a union shop agreement, but both are prevented from entering into such a voluntary agreement by the terms of the ordinance. [ ]

Defendants argue that by the Taft-Hartley Act (Labor Management Relations Act of 1947, 61 Stat. 136, as amended; 29 U.S.C.A. § 141 et seq.) the federal government has pre-empted the field of labor relations in which this complaint seeks state court relief. ■ Since the pleading does not suggest that the problems arising from defendants' attempt to unionize plaintiff's San Benito County contracting business have any relation to interstate commerce, we cannot assume that the national act has taken hold of the conduct here involved. (See *International Brotherhood of Teamsters* v. *Vogt, Inc.* (1957), 354 U.S. 284, 294 [77 S.Ct. 1166, 1 L.Ed 2d 1347]; *Thorman* v. *International Alliance etc. Employees* (1958), 49 Cal.2d 629, 632-633 [3, 4] [320 P.2d 494].) There-

---

brackets enclosing material denote insertions by this court; quotation marks indicate quotations from the complaint. (For a more complete explanation of our use of brackets to avoid the extension of quotation marks within quotation marks when adopting part or substantially all of an opinion of the District Court of Appeal, see *People* v. *Lyons* (1956), 47 Cal.2d 311, 314, footnote 1 [303 P.2d 329].)

fore, we need not be concerned, in our ensuing discussion of state law, with any possibility that such law, on the facts of this case, might conflict with the federal law.

The power of San Benito County (not a chartered county) in respect to this ordinance is defined by section 11 of article XI of the California Constitution, which provides that "Any county, city, town or township may make and enforce within its limits all such local, police, sanitary and other regulations as are not in conflict with general laws." ■ Even in matters of state-wide concern (see *In re Portnoy* (1942), 21 Cal. 2d 237, 239 [1] [131 P.2d 1] ; *Mann* v. *Scott* (1919), 180 Cal. 550, 556 [182 P. 281]), the city or county has police power equal to that of the state so long as the local regulations do not conflict with general laws. (*McKay Jewelers, Inc.* v. *Bowron* (1942), 19 Cal.2d 595, 600 [3] [122 P.2d 543, 139 A.L.R. 1188] ; *In re Iverson* (1926), 199 Cal. 582, 585 [1], 586 [3, 4] [250 P. 681] ; *Jardine* v. *City of Pasadena* (1926), 199 Cal. 64, 68 [1], 71 [3] [248 P. 225, 48 A.L.R. 509].)

■ California's leading case on the pertinent subject states the law as follows: "[4] . . . 'Where the legislature has assumed to regulate a given course of conduct by prohibitory enactments, a municipality with subordinate power to act in the matter may make such new and additional regulations in aid and furtherance of the purpose of the general law as may seem fit and appropriate to the necessities of the particular locality and which are not in themselves unreasonable.' [Citation.] The cases in this state have consistently upheld local regulations in the form of additional reasonable requirements not in conflict with the provisions of the general law. [Citations.]

■ "[5] This general rule permitting the adoption of additional local regulations supplementary to the state statutes is subject to an exception, however . . . Regardless of whether there is any actual grammatical conflict between an ordinance and a statute, the ordinance is invalid if it attempts to impose additional requirements in a field which is fully occupied by the statute. Thus, . . . an ordinance which is substantially identical with a state statute is invalid because it is an attempt to duplicate the prohibition of the statute. [Citations.] . . . The invalidity arises, not from a conflict of language, but from the inevitable conflict of jurisdiction which would result from dual regulations covering the same ground. Only by such a broad definition of 'conflict' is it possible to confine local legislation to its proper field of *supplementary* regulation."

(*Pipoly* v. *Benson* (1942), 20 Cal.2d 366, 370-371 [125 P.2d 482, 147 A.L.R. 515].)[3]

A further pertinent principle is: ''Where the Legislature has adopted statutes governing a particular subject matter, its intent with regard to occupying the field to the exclusion of all local regulation is not to be measured alone by the language used but by the whole purpose and scope of the legislative scheme. [Citations.]'' (*Tolman* v. *Underhill* (1952), 39 Cal.2d 708, 712 [6] [249 P.2d 280].)

State regulation of a subject may be so complete and detailed as to indicate an intent to preclude local regulation. (*Wilson* v. *Beville* (1957), 47 Cal.2d 852, 860 [8] [306 P.2d 789]; *Tolman* v. *Underhill, supra,* pp. 712-713 [6, 7] of 39 Cal.2d.) In this connection it may be significant that the subject is one which, in our view, as in *Tolman* v. *Underhill, supra,* p. 713 [7] of 39 Cal.2d, requires uniform treatment throughout the state. Furthermore, and of significance in impelling a conclusion that no part of the local ordinance can be effective, is the fact that in aspects wherein it does not subtantially either parallel or breach specific state legislation it conflicts, as hereinafter explained, with a general legislative declaration of policy. (See *In re Porterfield* (1946), 28 Cal.2d 91, 115-118 [27-28] [168 P.2d 706, 167 A.L.R. 675].)

No case has been found which discusses the question whether an ordinance which conflicts, not with statutory, but with decisional, law on a subject of state-wide concern, violates the requirement of section 11 of article XI of the state Constitution that local regulations must not conflict with ''general laws.'' But decision of this question is not now necessary because, as is hereinafter developed, the ordinance here attacked conflicts with California's statutory law.

The Legislature has not enacted a completely detailed scheme of regulation of the ''field'' which this ordinance is principally designed to affect; i.e., the legality of jurisdictional (or jurisdictional-organizational) strikes and of union shop or security agreements[4] and conduct intended to attain or

---

[3]We recognize that in *Pipoly* v. *Benson* the Chief Justice was dealing with a penal ordinance and that the ordinance with which we are concerned declares no penal sanction, but we nevertheless view the quoted language as applicable here.

[4]''Union security'' is a term which indefinitely may include the closed shop, the union shop, the preferential shop, and maintenance of membership. (See Teller, Labor Disputes and Collective Bargaining (1950 supp.), § 398.58.)

In present parlance a closed shop is ''An establishment in which the employer by agreement hires and retains in employment only union mem-

enforce such agreements, but it has declared both a general policy and basic regulations in implementation thereof which, as we view them, are fully comprehensive of the field. To show the impelling reasons for our views we examine in appropriate detail the pertinent statutes and the development of the relevant decisional law construing those statutes.

Prefatorily it is observed that the legality of the closed shop,[4] and of the strike and boycott, primary and secondary, as means of enforcing or seeking that objective, were recognized by this court at a comparatively early date, under common law principles, in *J. F. Parkinson Co.* v. *Building Trades Council* (1908), 154 Cal. 581 [98 P. 1027, 16 Ann.Cas. 1165, 21 L.R.A. N.S. 550], and *Pierce* v. *Stablemen's Union* (1909), 156 Cal. 70 [103 P. 324]. The legality of conduct akin to the "jurisdictional strike" (concerted union activity in connection with a dispute between "labor organizations," as that term is defined in legislation hereinafter quoted) was recognized, under an application of the principles of the Parkinson and Pierce cases, in *Greenwood* v. *Building Trades Council* (1925), 71 Cal.App. 159, 167, 175 [233 P. 823].

The Legislature tacitly recognized the propriety of the closed shop by statutes enacted between 1905 and 1921 (the provisions are now in Lab. Code, §§ 1010-1018) which make it criminal to falsely represent that union labor was employed

---

bers in good standing, except that, by some agreements, when union members are unavailable, the employer may hire nonunion workers provided they apply for union membership or obtain work permits before beginning work''; a union shop is ''An establishment in which the employer by agreement is free to hire nonmembers as well as members of the union but retains nonmembers on the payroll only on condition of their becoming members of the union within a specified time.'' (Webster's New Internat. Dict. (2d ed., 1958); Teller, Labor Disputes and Collective Bargaining (1950 supp.), § 398.59.) It is in this sense that it is said that section 8(a)(3) of the Labor Management Relations Act of 1947 (29 U.S.C.A. § 158 (a)(3), which does not use the terms ''closed shop'' and ''union shop'') ''forbids the closed shop and strictly regulates the conditions under which a union-shop agreement may be entered.'' (*Algoma Plywood etc. Co.* v. *Wisconsin etc. Board* (1948), 336 U.S. 301, 314 [69 S.Ct. 584, 93 L.Ed. 691].)

The terms did not always have these clearly distinguished meanings (e.g., Funk & Wagnalls New Stand. Dict. (1933 ed.) defines union shop as ''same as closed shop'') and the cases have not always used them in their presently recognized sense. For the purpose of our discussion herein possible uncertainty as to the meanings of ''closed shop'' and ''union shop'' in some of the cases is of no importance. What is important is that the cases recognize the lawfulness of union security agreements in general, provided that the circumstances of the agreement and the means used to negotiate it are not in themselves unlawful.

[4]See note 4 on page 177.

in the manufacture of goods, to forge a union label, and to use a union label without authorization.

With labor emerging from weakness toward power, the justness of its cause was gaining recognition. Such recognition did not come without struggle and strife, costly to labor, to management and to the public, but come it did. Eventually taking cognizance of the need for more equality in bargaining power as between workmen and employers, of the developing manifestations of change in political climate, of the growing competition between organized capital on the one hand and organized labor on the other, and between competing labor organizations, and the impact of all these competitions on the welfare of the general public as well as on that of the competing parties, both the Congress of the United States and the Legislature of this state adopted legislation establishing both general policy and certain implementations thereof. (See as to federal legislation: Norris-LaGuardia Act, 1932, 47 Stats. 70, 29 U.S.C.A. §§ 101-115, as amended; Wagner (National Labor Relations) Act, 1935, 49 Stats. 449, 29 U.S.C.A. § 151 et seq., as amended; Taft-Hartley (Labor Management Relations) Act, 1947, 61 Stats. 136, 29 U.S.C.A. § 141 et seq., as amended. And as to state enactments: Lab. Code, §§ 920-923, Stats. 1937, ch. 90, p. 208, based on Stats. 1933, ch. 566, p. 1478; Lab. Code, §§ 1131-1136, Stats. 1941, ch. 623, p. 2079, adopted by referendum at the 1942 general election, but see *In re Blaney* (1947), 30 Cal.2d 643 [184 P.2d 892] ;[5] Lab. Code, §§ 1115-1122, Stats. 1947, ch. 1388, p. 2952, as amended Stats. 1955, ch. 1417; Lab. Code, § 1126, Stats, 1941, ch. 1188, p. 2959.) ▆ It is important to note, as will hereinafter be emphasized, that notwithstanding the pushing and pulling as between "big business" and increasingly powerful labor organizations, the State of California—and the proponents of its legislation—made *welfare of the individual workmen,* through the principle of freedom to associate, organize and bargain collectively, the paramount principle of its legislation. The addition (by California's voters on referendum at the general election in 1942) of the "Hot Cargo" and "Secondary Boycott" Act[5] (Stats. 1941, ch. 623, p. 2079) and of the Jurisdictional Strike Law in 1947 (Stats. 1947, ch. 1388, p.

---

[5]The facts that this court (in *In re Blaney* (1947), *supra,* 30 Cal.2d 643, 650 [3]) held the "Hot Cargo" and "Secondary Boycott" statute to be so "sweeping, vague and uncertain" and so permissive of prior censorship of matters protected by the constitutional guarantees of free speech and press, and that its enactment was an emergency measure, do not obliterate the significance of its adoption.

2952) are indicative of growing public concern over the clashes arising from the proscribed activities, their undesirable effects, and of a desire to more clearly define and further implement the state policy against certain organizational and jurisdictional activities.

As hereinabove mentioned, in 1933 the California Legislature enacted the ''general laws'' (Stats. 1933, ch. 566, p. 1478) recast and adopted as sections 920 through 923[6] of the Labor Code in 1937, which sections, together with the Jurisdictional Strike Law[7] (Stats. 1947, ch. 1388, § 1, p. 2952, as amended

---

[6]Sections 920 through 923 appear (in Lab. Code, div. 2, pt. 3, ch. 1) under the chapter heading ''Contracts Against Public Policy.'' Section 920 defines ''promise.''

Section 921: ''Every promise made after August 21, 1933, between any employee or prospective employee and his employer, prospective employer or any other person is contrary to public policy if either party thereto promises any of the following:

''(a) To join or to remain a member of a labor organization or to join or remain a member of an employer organization,

''(b) Not to join or not to remain a member of a labor organization or of an employer organization,

''(c) To withdraw from an employment relation in the event that he joins or remains a member of a labor organization or of an employer organization.

''Such promise shall not afford any basis for the granting of legal or equitable relief by any court against a party to such promise, or against any other persons who advise, urge, or induce, without fraud or violence or threat thereof, either party thereto to act in disregard of such promise.''

Section 922: ''Any person or agent or officer thereof who coerces or compels any person to enter into an agreement, written or verbal, not to join or become a member of any labor organization, as a condition of securing employment or continuing in the employment of any such person is guilty of a misdemeanor.''

Section 923: ''In the interpretation and application of this chapter, the public policy of this State is declared as follows:

''Negotiation of terms and conditions of labor should result from *voluntary agreement* between employer and employees. Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. In dealing with such employers, the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore it is necessary that the *individual workman have full freedom* of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that *he shall be free* from the interference, restraint, or coercion *of employers of labor*, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.'' (Italics added.)

[7]Section 1115: ''A jurisdictional strike as herein defined is hereby declared to be against the public policy of the State of California and is hereby declared to be unlawful.''

Section 1116: ''Any person injured or threatened with injury by violation of any of the provisions hereof shall be entitled to injunctive relief

Stats. 1955, ch. 1417) encompassed as Labor Code, sections 1115 through 1122, together also with section 1126[8] of the Labor Code (added Stats. 1941, ch. 1188, p. 2959), constitute the statutory law with which we are here particularly concerned.

The first enacted portion of the subject legislation (Lab. Code, §§ 920-923) was considered and construed by this court in a series of cases including *McKay* v. *Retail Auto. S. L.*

therefrom in a proper case, and to recover any damages resulting therefrom in any court of competent jurisdiction.''

Section 1117: ''As used herein, 'labor organization' means any organization or any agency or employee representation committee or any local unit thereof in which employees participate, and exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, hours of employment or conditions of work, which labor organization is not found to be [or to have been] financed in whole or in part, interfered with, dominated or controlled by the employer [or any employer association within one year of the commencement of any proceeding brought under this chapter. The plaintiff shall have the affirmative of the issue with respect to establishing the existence of a 'labor organization' as defined herein].

''As used herein, 'person' means any person, association, organization, partnership, corporation, unincorporated association or labor organization.'' (The bracketed words were added by Stats. 1955, ch. 1417, § 1. It should be noted, by reference to footnote 1, that the definition of ''labor organization'' herein is substantially identical with that set forth in section 1 of San Benito County Ordinance No. 201.)

Section 1118: ''As used in this chapter, 'jurisdictional strike' means a concerted refusal to perform work for an employer or any other concerted interference with an employer's operation or business, arising out of a controversy between two or more labor organizations as to which of them has or should have the exclusive right to bargain collectively with an employer on behalf of his employees or any of them, or arising out of a controversy between two or more labor organizations as to which of them has or should have the exclusive right to have its members perform work for an employer.''

Section 1119: ''Nothing in this chapter shall be construed to interfere with collective bargaining subject to the prohibitions herein set forth, nor to prohibit any individual voluntarily becoming or remaining a member of a labor organization, or from personally requesting any other individual to join a labor organization.''

Section 1120: This is a separability clause which is immaterial to our discussion and, hence, is not quoted.

Section 1122: ''Any person who organizes an employee group which is financed in whole or in part, interfered with or dominated or controlled by the employer or any employer association, as well as such employer or employer association, shall be liable to suit by any person who is injured thereby. Said injured party shall recover the damages sustained by him and costs of suit.'' (Added by Stats. 1955, ch. 1417, § 2.)

[8]Section 1126 (under the title ''Collective Bargaining Agreements''): ''Any collective bargaining agreement between an employer and a labor organization shall be enforceable at law or in equity, and a breach of such collective bargaining agreement by any party thereto shall be subject to the same remedies, including injunctive relief, as are available on other contracts in the courts of this State.''

*Union No. 1067* (1940), 16 Cal.2d 311 [106 P.2d 373], *Shafer* v. *Registered Pharmacists Union* (1940), 16 Cal.2d 379 [106 P.2d 403], and *C. S. Smith Met. Market Co.* v. *Lyons* (1940), 16 Cal.2d 389 [106 P.2d 414].

In the McKay case *plaintiffs-employes had chosen their own representatives to bargain with their employer and were satisfied with their relations with their employer.* From the fact that the McKay employes had chosen their own representatives and authorized them to bargain with their employer it is apparent that (unless they were employer financed or controlled or "interfered with") they had a "labor organization" within the definition of that term as used in the Jurisdictional Strike Law, which was subsequently enacted and is hereinabove quoted[7] and hereinafter discussed. Whether plaintiffs' organization (in the McKay case) was a company union or a small independent union was not decided by the court.[9] *In either event,* it was held, plaintiffs could not have equitable protection against defendant unions' concerted activity (picketing and promotion of secondary boycotts) designed to attain a "closed union shop" or "union shop" with certain of the demanding unions displacing the independent union and becoming the exclusive bargaining agents of the unwilling employes. *C. S. Smith Met. Market Co.* v. *Lyons* (1940), *supra,* 16 Cal.2d 389, 395-396 [3-6], reaffirmed the view that it was lawful to engage in concerted union activity, including the secondary boycott, designed to attain "a closed union shop" where the activity was directed against an employer to induce him to compel his employes (who were satisfied with the terms of their employment, which included an open shop without discrimination against union employes) to subject themselves to the unwanted jurisdiction of, and representation by, the invading union. These cases (McKay and C. S. Smith), it is, or in later discussion will become, obvious, have been superseded to the extent that they are inconsistent with the Jurisdictional Strike Law. The subject cases, however, have not been supplanted or overruled insofar as they hold that Labor Code sections 920 through 923 do "not prohibit closed union shop contracts." (McKay, p. 327 [15] of 16 Cal.2d.)

In the Shafer case (1940), *supra,* 16 Cal.2d 379, the facts, presented by agreed statement, were not in dispute. Plaintiff

---

[9]In the dissent authored by Mr. Justice Curtis it is stated that (p. 338 of 16 Cal.2d) "[T]here is absolutely nothing in the pleadings to warrant any assumption that the present organization of the plaintiffs' employees is what is called a 'company union' or is dominated by the employer."

employer had a collective bargaining agreement with defendant union. So far as appears, such agreement had been lawfully negotiated and the union, at the time of the hereinafter described strike which resulted in the litigation, was the duly authorized and freely chosen representative of plaintiff's striking employes. It is not necessary, therefore, at this time to inquire into the circumstances which led to the initial signing of the collective agreement. (P. 381 of 16 Cal.2d.) "The parties are agreed that the effect of their contract was to require the employer to retain only union-member pharmacists in employment and to recognize the defendant union as the sole collective bargaining agent of the employees who were subject to it. At the end of the year the respondent [plaintiff employer] refused to renew the agreement unless the closed shop provisions were deleted . . . Thereupon, the union [presumptively as authorized by the employes] declared a strike against him and started picketing his stores." The court stated that (p. 380) "The determinative question . . . is whether closed union shop agreements have been rendered unlawful in this state by virtue of the enactment of sections 920, 921, and 923 of the Labor Code." The court properly concludes that the subject legislation does not proscribe such contracts but in reaching its conclusion engages in some discussion which requires further attention if the legislation is to be fully understood.

In reading the following paragraphs it is important to bear in mind that section 921 by its precise language applies only to a "promise . . . between any employee or prospective employee and his employer, prospective employer or any other person" (i.e., any person acting on behalf of the employer). After quoting sections 921 and 923 (hereinabove quoted)[6] the court continues (p. 383 of 16 Cal.2d) : "Concerning these provisions the respondent argues that a closed union shop contract violates the terms of section 923 in that it deprives the individual employee of his right of 'freedom of association, self-organization, and designation of representatives of his own choosing' guaranteed by that section. Moreover, it is said, such a contract also violates section 921 because its effect is to require an individual employee 'to join' and 'to remain a member of a labor organization.' On the other hand, the appellants contend that these measures were drafted and proposed at the instance of organized labor for the purpose of

[6]See footnote 6 on page 180.

extending and safeguarding the principle of collective bargaining, and considering their history and background, they should not be interpreted contrary to the principle they were designed to promote. . . .

"Impartial studies of the labor movement in this country show that for many years the extension of collective bargaining in industrial relations has been opposed by employers. Chief among the devices resorted to for that purpose has been the anti-union or 'yellow dog' contract, *an agreement between an employer and his employee* which, in its usual form, provides that the employer will maintain his business on a nonunion basis and the employee will not become a member of any labor union during the course of his employment. . . .

"However, with the growth of the labor movement in this country and the development of public opinion more favorable to collective bargaining, industry found it advisable to change the methods of opposition. Many employers, although professing to accept the principle of collective bargaining and unionization by which it is made effective, either directly or indirectly sponsored company controlled unions having no members except their own employees, and by that means were able to minimize the workers' demands. This was a change in method only. . . .

"[P. 385 of 16 Cal.2d.] The California legislation is the result of labor's efforts [to outlaw "yellow dog" contracts and regulate company unions] . . . [P. 386.] Bearing in mind the necessity for economic equality as a foundation for fair bargaining, the plain language of section 921, when read in connection with the declaration of policy contained in section 923, can only mean that the term 'employer organization,' as used in each subdivision of the former, refers to an association of employers and not to a company union, as the respondent contends.

"*Considering another point made by the employer* in this connection, the clause 'to join or to remain a member of a labor organization' may not reasonably be construed as prohibiting a promise to join an independent labor union. Although the term 'labor organization,' taken by itself, is broad enough to refer to either a company or an independent union, the purpose of the legislation must be considered in arriving at a conclusion concerning its meaning. If the words are meant to designate an independent union, then it is against public policy for an employee or prospective employee to join such an organization, which is a result exactly contrary to the dec-

laration of policy in section 923. In matters of both employment and concerted activity for the purpose of collective bargaining, reads this section, the employee 'shall be free from interference, restraint or coercion of employers of labor, or their agents.' *What is this 'interference, restraint or coercion' which should not be exercised against employees?* Obviously it is anything which is a barrier to the full freedom of association and self-organization without which 'the individual unorganized worker is helpless to exercise actual liberty of contract.' *Who should not interfere with the employees' rights?* 'Employers of labor or their agents,' says the statute. Nowhere is there the suggestion that some employees must be protected against other employees.

 *"These and other considerations render untenable the contention that union shop contracts in California are void under section 921.* *As has already been noted, the usual company union contract is an individual agreement between the employer and an employee, whereas the union shop contract is an agreement running between the employer and the union as an entity."* (Italics added.)

 The important holding of Shafer is the conclusion that section 921 does not preclude union shop agreements "between the employer and the union as an entity" (p. 387 [5]). That holding is correct. It is correct because the language used in section 921 means exactly what it says, not because the identical words "labor organization" can or should be held to mean one type of labor organization in one sentence and an opposingly different type in the next sentence. The only "promise" whatsoever which the language of section 921 mentions is the promise of the individual workman made directly with *"his employer, prospective employer or any other person,"* the "any other person," in context, obviously meaning a person acting on behalf of the employer. By no warrantable interpretation of the language used could it be held to include (and thereby to proscribe) a *collective bargaining agreement*—an agreement entered into by and between the employer and a labor organization, the latter acting as the agent or representative of the workmen, voluntarily authorized by them to negotiate and agree on the terms and conditions of their employment. Obviously a promise of an individual workman with his employer to join or not to join a "labor organization" is not at all the same thing as a contract between a labor organization on the one hand and an employer on the other. The court, itself, in the Shafer case furnishes

the key to the meaning of section 921, and a sound basis for the court's conclusion, when it says, as quoted above, ''[T]he usual company union contract is an individual agreement between the employer and an employee, whereas the union shop contract is an agreement running between the employer and the union as an entity.'' We think that the court's hereinabove quoted discussion of the suggested opposing meanings of the term ''labor organization'' in succeeding sentences of section 921 is properly to be understood as constituting a recitation of, and comments on, one of the arguments which was presented to the court but not as forming the controlling basis for its conclusion.

If there were otherwise any doubt as to the correct interpretation of section 921 that doubt would disappear when section 921 is read, as it should be, in the light of the wording of section 923. Sections 921 and 923 fit together perfectly to make clear both the overriding policy and its implementation in the premises. The predominant concern of each section is the welfare of the *individual workman,* and *to that end* the fostering of collective bargaining. Section 921 protects the individual against pressures from his employer that *he as an individual workman* make any compact with the employer curtailing the workman's right to organize and bargain collectively while section 923 declares the personal right of each workman to join with his fellows in forming an association to act and bargain as a unit, and to that end each workman to ''have full freedom of association . . . and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment.'' An important question, however, arises from section 923 as to the circumstances and extent under and to which the ''full freedom'' of the individual workman, therein declared, may be limited—if it may be at all curtailed—by union security provisions in collective agreements.

Inherent in government—in all social and economic regulation—is an area of give and take. There must be a weighing of values. It is of primary importance that the individual workman have protection—that *he* have ''full freedom'' of ''self-association'' and in the designation of representatives of ''his own choosing.'' But it is also essential that the group's lawfully selected negotiators have power and freedom of contract to secure the workman's interests by contract with employers, and that for the ultimate benefit of each individual workman the authorized representative

shall be able to wield the collective power of all. It is in this field of workman-labor-organization-management relations that the balancing of relative values becomes most delicate.

Considerable assistance in understanding the legislative objectives, and therefore the legislative language, in the enactment of Labor Code, sections 921 through 923, as well as the subsequently enacted Jurisdictional Strike Law, may be derived from discussions by law writers contemporaneously with the adoption of the earlier sections and their judicial construction and application in the already noted cases of *McKay* v. *Retail Auto. S. L. Union No. 1067* (1940), *supra,* 16 Cal.2d 311; *Shafer* v. *Registered Pharmacists Union* (1940), *supra,* 16 Cal.2d 379; *C. S. Smith Met. Market Co.* v. *Lyons* (1940), *supra,* 16 Cal.2d 389; and also in *Fortenbury* v. *Superior Court* (1940), 16 Cal.2d 405 [106 P.2d 411]. The McKay case was the subject of particular comment after its tentative decision by the District Court of Appeal in 1939.

The view of the District Court of Appeal in that case (opinion reported in (1939), (Cal.App.) 89 P.2d 426; opinion on denial of rehearing reported in (1939), 90 P.2d 113; vacated when this court granted a hearing) is discussed in 2 Teller, Labor Disputes and Collective Bargaining (1940), § 461, p. 1359, under the section heading ''Judicial Applications of Anti-Yellow-Dog Statutes.'' As the Teller work points out (1 op.cit., § 48, p. 118), ''The typical yellow-dog contract is an at-will employment agreement which contains, in addition to the usual provisions for employment, the following three provisions: (1) a representation by the employee that he is not a member of a labor union; (2) a promise by the employee not to join a labor union; (3) a promise by the employee that, upon joining a labor union, he will quit his employment.'' From the placement of his discussion in a section directed to anti-yellow-dog statutes it appears that Teller correctly assumes that the legislation considered in McKay (Lab. Code, §§ 920-923) is primarily concerned with contracts between the individual workman and the employer. He says:

''The danger inherent in labor law statutes at the hands of a judiciary unmindful of the historical facts behind such legislation has already been demonstrated by a California court in relation to an anti-yellow-dog contract statute of the type which declared the contract void and denied to it any legal or equitable relief. In *McKay* v. *Retail Automobile Salesmen,* it was held [by the District Court of Appeal in its vacated opinions reported in (Cal.App.) 89 P.2d 426, 90 P.2d 113] that

a contract for a closed shop entered into between an employer and a bona fide labor union was unenforceable where the contract was executed without consulting the employer's employees. The employees, reasoned the court, would thereby and in violation of the statute be compelled to join a labor union as a condition of their remaining in employment. A statute designed to eliminate interference with labor organizations was thus construed to hinder it.''

Mr. Teller's just quoted language in respect to the tentative decision of the District Court of Appeal is not very clear. But his position as to the decisions of this court in McKay and companion cases is obvious from his discussion in the 1947 Supplement to Labor Disputes and Collective Bargaining, § 461, pp. 408-409. There he says:

''The McKay case was reversed[10] by the Supreme Court, the high California court holding labor activity legal though carried on against the desires of the employer's employees. [(1940), 16 Cal.2d 311 (106 P.2d 373)], cert. den. 313 U.S. 566, 61 S.Ct. 939, 86 L.Ed. 1525 (1941). Accord: *Smith Metropolitan Market Co.* v. *Lyons* [(1940), 16 Cal.2d 389 (106 P.2d 414)]; *Lund* v. *Auto Mechanics' Union* [(1940), 16 Cal.2d 374 (106 P.2d 408)]. Picketing or striking for a closed shop is also lawful in California. *Shafer* v. *Registered Pharmacists Union Local* [(1940), 16 Cal.2d 379]. In the Shafer case, *supra*, the Court considered the background of Sections 921 and 923 of the Labor Code and concluded that nothing therein contained was a bar to closed shop contracts with labor organizations, or (see *Smith Metropolitan Market Co.* v. *Lyons, supra*), picketing carried on by labor unions in the absence of a labor dispute between the picketed employer and his employees. . . .

''*There is reason to pause, before according to labor unions the right to engage in labor activity for the closed shop in connection with employers whose employees do not desire to be represented by unions.* The National Labor Relations Act has expressed a policy in favor of closed shop contracts only where a *majority* of the employer's employees in an appro-

---

[10]Judgments of the District Court of Appeal are not ''reversed.'' Such judgments are in effect only tentative until they become final as provided by rule of the Judicial Council (Cal. Const., art. VI, § 4d) and until they become final are subject to being automatically vacated upon transfer of the cause to the Supreme Court. (Rules on Appeal, rule 28.) Upon such transfer the decision of the District Court of Appeal becomes a nullity and its opinion has no authoritative effect. (*Ponce* v. *Marr* (1956), 47 Cal.2d 159, 161 [1] [301 P.2d 837]; cases collected in 6B McKinney's New Cal. Dig. (1955), Courts, § 137.)

priate unit have authorized the contracting union to deal for them. . . . It has therefore been indicated that a labor union may not seek to compel an employer to enter into a closed shop contract unless the union represents a majority of the employer's employees. See *Pauly Jail Building Company* v. *International Association*, 118 F.(2d) 615 (C.C.A. 8th, 1941)." (Italics added.)

In interpreting sections 921 through 923, particularly as to certain applications hereinafter developed, it is to be borne in mind that an authorized union which contracts with an employer acts as an entity or institution which is distinct from the individual workmen who are or may become the beneficiaries of its bargaining. (See e.g., *Association of Westinghouse Salaried Emp.* v. *Westinghouse Elec. Corp.* (1955), 348 U.S. 437 [75 S.Ct. 489, 99 L.Ed. 510]; see also Mendelsohn, *Enforceability of Arbitration Agreements Under Taft-Hartley, Section 301* (1956), 66 Yale L.J. 167, 196-202; *Shafer* v. *Registered Pharmacists Union* (1940), *supra*, p. 387 [5] of 16 Cal.2d.) For example (with full recognition of the differences in legal theories, statutes, and results in various jurisdictions), we note that (1) an individual workman, when he is hired by an employer who is a party to a collective agreement, gets rights derived from the collective agreement; (2) there are strong practical reasons which support holdings that the union cannot and the individual workman can maintain an action to enforce such a predominantly individual right as that of the workman to the wages to which he is entitled by virtue of the collective agreement plus the individual contract of hire (see *Association of Westinghouse Salaried Emp.* v. *Westinghouse Elec. Corp.* (C.A. 3, 1954), 210 F.2d 623, 626, 629, affmd., *Association of Westinghouse Salaried Emp.* v. *Westinghouse Elec. Corp.* (1955), *supra*, 348 U.S. 437, 455-460 [75 S.Ct. 488, 99 L.Ed. 510]; *Sublett* v. *Henry's etc. Lunch* (1942), 21 Cal.2d 273, 275 [131 P.2d 369]); (3) on the other hand, the union can sue to enforce a predominantly institutional right under a collective agreement; e.g., an arbitration clause (in a federal court under federal law; § 301 of the Taft-Hartley Act, 29 U.S.C.A. § 185; *Textile Workers Union* v. *Lincoln Mills* (1957), 353 U.S. 448, 456 [77 S.Ct. 912, 1 L.Ed.2d 972]) or union shop clause (in a California court under California law; *Silva* v. *Mercier* (1949), 33 Cal.2d 704, 706 [1], 707 [2] [204 P.2d 609]); but it has been held that an individual union workman who is discharged and replaced by a nonunion employe has no cause of action against the em-

ployer for damage suffered as a union member because of the employer's violation of a union shop clause in a collective agreement (under California law as interpreted by a federal court; *MacKay* v. *Loew's, Inc.* (C.A. 9, 1950), 182 F.2d 170 [18 A.L.R.2d 348, 351]).

As we have hereinabove indicated, the language used in section 921[11] is designed to cover only promises between the individual workman on the one hand and his employer on the other; it has no direct application to agreements between an authorized union bargaining agent as one party and the employer as the other party. It is equally clear that nothing in the subject section (§ 921) purports to limit the freedom of contract as between an employer or prospective employer and an *organization* which is authorized to negotiate contracts on behalf of the affected workman. Pertinent and persuasive of legislative intent to the contrary, and therefore helpful to understanding of 921, section 923 specifies that ''In the interpretation and application of this chapter, the public policy of this State is declared as follows:

''Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees. Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. In dealing with such employers, the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore it is necessary that the *individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment,* and that *he shall be free from the interference, restraint, or coercion of employers* of labor, or their agents, *in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.''* (Italics added.)

It has been suggested that because the opening sentence of section 923 reads, ''In the interpretation and applica-

---

[11]Section 921: ''Every promise made . . . between any *employee* or prospective employee *and his employer,* prospective employer . . . is contrary to public policy if either party thereto promises . . .: (a) To join or to remain a member . . . or . . . (b) Not to join or not to remain a member of a labor organization or of an employer organization. . . . (c) To withdraw from an employment relation in the event that he joins or remains a member of a labor organization or of an employer organization.''

tion of *this chapter* [italics added], the public policy of this State is declared,'' etc., its application should be limited to that chapter. But it is well established that the declared policy is not limited to ''the interpretation and application of this chapter'' (Lab. Code, div. 2, pt. 3, ch. 1). When this court first had occasion to consider that section (in *Levy* v. *Superior Court* (1940), 15 Cal.2d 692, 704 [104 P.2d 770, 129 A.L.R. 956]), it was not in connection with ''this chapter'' but in connection with a holding that an arbitrator's award under a collective bargaining agreement could be the subject of court confirmation and enforcement under our arbitration statute (Code Civ. Proc., §§ 1280-1293). This court said, ''This declaration [§ 923] evidences the existence of a policy to uphold the freedom of employees to organize and to enter into collective bargaining contracts for their own protection. . . . It would be difficult to uphold such a policy without recognizing the right of enforcement of collective bargaining contracts when voluntarily entered into by the unions.'' And *In re Porterfield* (1946), *supra,* 28 Cal.2d 91, 115-118 [27, 28] [168 P.2d 706, 167 A.L.R. 675], established that the policy declared in section 923 of the Labor Code is not limited to the interpretation of the chapter of the code of which that section is a part, but is a general independent declaration of state policy, and local legislation in conflict therewith is void. Specifically, it is there held that section 923 declares ''a state policy of complete freedom in regard to the formation of labor organizations to the end that there may be collective action by workmen,'' and that a municipal ordinance which imposed a license tax upon paid labor organizers was invalid because it conflicted with that legislatively declared state-wide policy.

At this point certain principles and objectives of California's labor laws will have become apparent; but it is likewise apparent that in the road leading to those objectives there is an area wherein several excellent values will assert respectively conflicting claims. We list first the indicated principles and objectives and thereafter suggest some of the values and their conflicting claims.

*Some Principles and Objectives of California's Labor Law*

1. Both labor and management are encouraged toward, and protected in, the formation of their own respective organizations. (Lab. Code, § 923.)

2. The individual workman shall have full freedom of self-organization and designation of representatives of his

own choosing, completely free of employer influence or ''interference,'' to the end that an agent chosen by the workmen voting individually may represent them collectively in negotiating the terms and conditions of their employment. (*Id.*)

3. Collective bargaining, implicitly including union security measures, should result from ''voluntary agreement between employer and employees,'' the latter acting (of necessity if it be *collective* bargaining) through their chosen collective bargaining representative (*Id.*)

4. The employes as individuals shall be free from *employer* influence either to organize or not to organize and, if they elect to organize, in the choosing of their representatives. If organized by the employes' free act, the workmen through their selected representatives are free to bargain collectively.

Corollarilly, the employer (absent some legal impediment not here suggested) is free to bargain with the employes' authorized representatives but is not free to interfere with, restrain or coerce his employes in their selection of a collective bargaining representative. (Lab. Code, §§ 921, 923.)

5. The avoidance of violence in labor-management, organizational and jurisdictional matters is a policy of the state and, to that end, it is desirable to regulate, or as to some objectives and in some circumstances to prohibit, activities which create or foster situations which are conducive to mass emotions and violent acts. (Id.)

6. The Legislature (as is hereinafter shown in more detail), implementing the policy noted in the preceding paragraph, has declared unlawful various activities by unauthorized unions or organizers which have as their objective the securing of jurisdiction over the unwilling workmen of any particular employer or group of employers or an employes' group, by means other than (speaking generally) an intellectual appeal. (Lab. Code, §§ 1115-1122, 1126.)

### Conflicting Claims of Relative Values

In a general sense, there should be no serious dispute as to the acceptability of the following principles: (1) That the terms and conditions of labor employment be fixed through bargaining; (2) that the bargaining power of management and labor be substantially equal; (3) that labor-management contracts result from voluntary agreements; (4) that lawful collective agreements be mutually respected and enforceable; (5) that physical violence in labor disputes be avoided; (6) that the individual workman be free from employer influence in selecting his bargaining agent; (7) that the individual

workman have an unimpeded right ("full freedom") to express his personal choice in the selection of a representative and a like voice in governing the affairs of his organization.

The difficulties arise in the practical attainment of the desirable ends and among those difficulties the following are noted:

Probably above all else in principle, democracy in labor unions is important to the workman. Democracy to an individual workman may conceivably mean (we are not at this point intimating any view as our own) any or all of the following "rights": to belong to a union, or not, as he may choose; to freely select his own bargaining agents; to change them when he wishes; to have the power, through majority vote, to instruct his representatives as to the terms and conditions of labor which he wishes to have negotiated; to *not* be excluded from employment in a particular shop because of a union shop contract with a union other than his own; to *not* be compelled to pay union dues as a condition of retaining employment in a shop wherein the contract has been negotiated neither by his own union nor by any representative authorized by him, and perhaps not even in an industry wherein the contract has been negotiated by his own union; etc. But no more can the rank and file individual workmen conduct the business of a union than can the rank and file voters of a nation or state conduct its governmental and business affairs. Even though we pride ourselves in our democracy, we run the business of our country as a republic; i.e., through elected representatives and through officers and agents who have either been elected, or been appointed by those who have been elected.

To union officers, some of the following considerations may appear in the forefront of importance: In the broader markets union labor must compete with nonunion labor as well as with the organized power of management; the closer the union comes to complete control of the relevant labor market the greater will be its ability to negotiate on substantially equal, or superior, terms with management, and to that end recruitment of members by various concerted pressures, as well as by purely intellectual appeals, will appear highly desirable, if not necessary. As to authority to act, the negotiating officers no doubt will feel that they should be able to make firm offers and demands and have available an area for give and take; they must base their demands on an ac-

curate analysis of complex factors and may, themselves, distrust the judgment of the rank and file members on business matters; the union negotiators must be free to act with dispatch. Furthermore, it may be assumed the officers believe that the union needs power to combat employer tactics which might follow execution of the collective agreement, and to that end want a definite term contract with provisions for a union shop, exclusive bargaining rights, maintenance of membership, charge-off of dues, etc. It thus becomes apparent that, even as in governmental affairs generally, he who organizes and gains the strength of united effort must to that end surrender some portion of his individual freedom. To determine within the issues of the litigation before us the extent to which the law of California regulates the freedom of the individual workman and the power of his union over him as opposed to his power over the union, is essential to proper resolution of such issues.

Certainly advancement of the interests of the individual workman, of his right to organize and to bargain collectively—service to benefit *him* in all the conditions and circumstances of his work—is the compelling reason for governmental protection of labor organizations. As nearly as labor may be said to have a governmentally declared Bill of Rights in California, it is that enunciated in section 923. It is that section which undertakes to insure to each individual workman freedom to associate, to organize, to select representatives to negotiate for his group, and through those representatives and the strength of his organization, to bargain collectively. In particular it is that section which provides for the workman whatever democracy there may be in his union. The American Civil Liberties Union in an official statement entitled "Democracy in Labor Unions" (Sept. 1958, Report) has well enunicated the important principles which, insofar as they are statutorily protected at all in California, find primary declaration in Labor Code, section 923, with further implementation as to certain applications of those principles encompassed in sections 921 and 922, 1115 through 1122, and section 1126. The statement of the American Civil Liberties Union is of particular significance in that it strongly supports the forthright acceptance of section 923 in its solicitude that "the individual workman have full freedom of . . . *self*-organization, and designation of representatives of *his own* choosing, to negotiate the terms and condi-

tions of his employment'' (italics added), and at the same time recognizes that practicality presents obstacles which preclude Utopia in union democracy.

## ''Democracy in Labor Unions

''For the American Civil Liberties Union there are at least three compelling reasons why unions should have a special responsibility to maintain democratic standards.

''First, a union in collective bargaining acts as the representative of every worker within the bargaining unit. It speaks for him, makes choices of policies which vitally affect him, and negotiates a contract which binds him. His wages, his seniority, his holidays, and even his retirement are all governed by this contract which becomes the basic law of his working life. The union in bargaining helps make laws; in processing grievances acts to enforce those laws; and in settling grievances helps interpret and apply those laws. It is the worker's economic legislature, policeman, and judge. The union, in short, is the worker's industrial government. The union's power is the power to govern the working lives of those for whom it bargains, and like all governing power should be exercised democratically.

''Second, unions should be democratic because the power which they hold over the individual worker is largely derived from government. Labor relations acts such as the Wagner Act affirmatively protect the right to organize and place the government's stamp of approval on unionization. Even more, these statutes provide that government shall certify unions as the officially designated representatives and compel employers to recognize these unions as the exclusive representatives of all workers within the bargaining units. Unions, in the exercise of these powers derived from government, should maintain the same democratic standards required by government itself.

''Third, unions should be democratic because their principal moral justification is that they introduce an element of democracy into the government of industry. They permit workers to have a voice in determining the conditions under which they shall work. This high objective of industrial democracy can be fulfilled only if unions which sit at the bargaining table are themselves democratic. Only to the extent that workers are allowed to participate in determining union policies do they become self-governing.

## "THE OBSTACLES OF UNION DEMOCRACY

"Any demands for union democracy must be tempered with a clear recognition of the serious obstacles which face unions in maintaining democratic standards. Historically, many unions have had to struggle for survival against deadly attacks by employers who did not hesitate to use spies, bribery, intimidation, or even physical violence. Although large segments of management have fully accepted collective bargaining, anti-union practices are not dead and the old fears remain. Employers are not the only enemy, for rival unions may constantly threaten the union's very existence by raiding its membership or seeking to supplant it as bargaining representative. Even though employers accept unions and no rival union threatens, much of collective bargaining is carried on with the prospect of an ultimate deadlock and resort to economic force. The state of siege, the cold war, and the strike do not provide a healthy climate for the growth of democratic processes. . . ."

After stating the view that a workman having trouble within his union "can place little reliance on the courts, for [first] their results are too unpredictable" and, second, "judicial remedies are so costly and time consuming that few workers can afford to vindicate their rights," the ACLU report continues: "The third weakness of judicial relief is that many union members have such a deep-seated hostility to the courts that any action may be self-defeating. In a number of instances courts have removed racketeering leaders from office and held new elections only to have the same leaders reelected. The desire to repudiate judicial interference is greater than the desire to repudiate corrupt leadership. . . .

"At the present time the only effective protection is given by the courts. They are burdened with out-moded rules and a confusing body of precedents, resort to them is costly and time consuming, and they are viewed with such hostility by union members that their action is often self-defeating. It is clear that further protection is needed. . . .

"The ACLU still believes that organized labor can and should provide protection of union democracy. . . . If unions fail to take effective action to provide increased protection for the rights of union members, then no alternative is left but to seek increased legal protection."

Neither before nor since the 1947 and 1955 enactments (adding and amending the Jurisdictional Strike Law) has California's statutory law prohibited collective bargaining agree-

ments relating to union security, insofar as the word "security" is used in a legitimate sense. As has been shown hereinabove state laws as interpreted and applied by the courts prior to the Jurisdictional Strike Law of 1947 had permitted recruitment of individual workmen by unions engaged in organizational (more accurately, jurisdictional) drives, aided and abetted by employer action, voluntary or union-compelled. State laws as they should be interpreted and applied, at least since the 1947 and subsequent enactments, continue to permit, to encourage and protect collective bargaining agreements which have been freely negotiated and entered into by and between employes' lawfully authorized organizations and their employers whereby the interests of each party may be advanced. These interests, on the part of labor, of course include reasonable union security clauses, but if we are to give reasonable effect to the plain language of section 923, as it should be understood in the light of the policy of the state as more particularly defined in the legislation of 1947 and subsequent amendments, neither an unauthorized union or pretending employes' agent nor an employer acting alone or in concert with any unauthorized employe representative may lawfully attack an established employer-employe relationship and compel the unwilling employes to join the *particular* unchosen union as a condition of retaining or obtaining employment.

If employes have voluntarily become members of any "labor organization" (not financed or interfered with by their employer, Lab. Code, § 1117) and have thereby or therein selected and authorized a bargaining agent, such agent and the employer are free to bargain for the respective legitimate objectives of both workmen and employer. The ensuing collective agreement may, of course, include provisions for union security, such as a union shop, maintenance of membership, and exclusive bargaining rights with the employer. Having freely participated (or had the opportunity to so participate) in the selection of his bargaining agent and in the authorization of that agent to negotiate terms and conditions of employment for him, the workman, like the employer, is bound by the contract negotiated. And the workman, whether union or nonunion, who thereafter requests employment in a capacity covered by the contract must be deemed to accept the terms of the contract when he accepts such employment. But there are certain rights of the individual workman which should

be held inalienable and which no contract, whether made by the individual or by his group, can bargain away.

■■■ No compact between an employer and a labor organization can deprive the employes initially or permanently of their "freedom" to participate in the selection, or in the changing if they see fit, of their bargaining representatives. It is entirely unnecessary, and would go beyond the issues at bench, for us to consider at this time what limitations, if any, may reasonably be placed on such matters as the freedom of employes to reorganize, or to hold elections for the selection or retirement of their representatives, or to declare new objectives for collective bargaining negotiations. The need for and scope of any such regulations could well have legislative attention. ■■■ It is sufficient here to suggest that in ordinary governmental matters—national, state and local—every citizen of adult age has the right to vote (unless he has lost it, as in the event of imprisonment for felonious crime) but his representatives, once elected, serve for a term of years (unless, as is provided for in some states, sooner recalled). And it is imperative to remember that if the workmen have no vote in choosing those who negotiate the terms and conditions under which they are to labor then, *a fortiori*, they have no voice at the bargaining table. This would not be the "full freedom" which section 923 purports to insure them; rather, it would be something akin to serfdom. And if a workman with established employment is compelled on pain of dismissal from such employment to pay dues to an invading union which he has not had a voice in selecting as his representative, that is taxation without representation.

The issue here is not between labor and management; it is between the workmen and the unions: Are we to have workmen's unions with unions' officers? Or bosses' unions with unions' workmen? Section 923 spells the answer.

■■■ The right of the workman to participate in the selection of his bargaining agent and in the government of his union is the workman's right of self-determination. Organization and collective bargaining are but tools to that end.

■■■ A strike with a jurisdictional objective is unlawful in certain applications hereinabove suggested and hereinafter discussed, not because a strike as such is unlawful or unprotected but because it, like any other concerted action, must have a lawful objective. In *James* v. *Marinship Corp.* (decided 1944, before enactment of the Jurisdictional Strike Law), 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900], this

court in a pioneering opinion held: "[P. 728.] [1] It should be recognized . . . that a union may use the various forms of concerted action, such as strike, picketing, or boycott, to enforce an objective that is reasonably related to any legitimate interest of organized labor. [Citations.] [2] It is equally well settled that the object of concerted labor activity must be proper and that it must be sought by lawful means, otherwise the persons injured by such activity may obtain damages or injunctive relief. [Citations.] [3] Although recent decisions in the United States Supreme Court hold that a state cannot deprive labor unions of the right of free speech through peaceful picketing [citations], these decisions do not deny a state the power to protect against abuses of the right. . . . [P. 730.] [I]n *Senn* v. *Tile Layers P. Union,* 301 U.S. 468 [57 S.Ct. 857, 81 L.Ed. 1229], the leading case associating picketing with the right of free speech, the court, while affirming the action of a state court in refusing to enjoin picketing to compel Senn to stop working with his own hands, stated (p. 481) : 'Whether it was wise for the State to permit the unions to do so is a question of its public policy—not our concern. The Fourteenth Amendment does not prohibit it.' Thus a state may impose limitations upon picketing or other concerted action if the 'end sought' is not permissible under state law and public policy . . . [P. 731, [14].] Where a union has . . . attained a monopoly of the supply of labor by means of closed shop agreements and other forms of collective labor action, such a union occupies a quasi public position similar to that of a public service business and it has certain corresponding obligations. . . . Its asserted right to choose its own members does not merely relate to social relations; it affects the fundamental right to work for a living. [Citations.] . . . [P. 732, quoting from *Wilson* v. *Newspaper & Mail Deliverers' Union* (1938), 123 N.J.Eq. 347 [197 A. 720].] '[T]he holders of the monopoly must not exercise their power in an arbitrary, unreasonable manner so as to bring injury to others.' . . . [P. 734.] [A]s said in 4 Restatement, Torts, page 136, comment to section 794: 'The expression of public policy is not confined to legislation and criminal law; in passing upon the propriety of an object [of concerted labor action], public policy otherwise defined is an important factor. If the object is an act against which the law has definitely set its face, it is not a proper object of concerted action.' "

■ In full accord with the above quoted holding is 4 Restatement, Torts, section 794, page 135: "An act by an employer which would be a crime or a violation of a legislative enactment or contrary to defined public policy is not a proper object of concerted action against him by workers." Supporting the same principles see, e.g., *Hughes* v. *Superior Court* (1948), 32 Cal.2d 850 [198 P.2d 885], affirmed *Hughes* v. *Superior Court* (1950), 339 U.S. 460 [70 S.Ct. 718, 94 L.Ed. 985]. And, as forcefully put by Professor Francis E. Jones, Jr., writing in the Southern California Law Review (1956, Vol. 29, p. 137 at 159) on the subject *"Free Speech and Picketing"*: "One very persuasive argument for the inexorable validity of the unlawful objective test is the complete reluctance of the labor counsel to attack it. Counsel for appellant union pickets in the *Giboney* case [*Giboney* v. *Empire Storage & Ice Co.* (1949), 336 U.S. 490 (69 S.Ct. 684, 93 L.Ed. 834)] made no effort in their appellate brief to refute the unlawful purpose test . . . Equally persuasive, considering the source, as an acceptance of the test by labor, and well-nigh conclusive, because of the inescapability of the argument, is the following excerpt from an article in *The American Federationist* [Sept. 1949, "High Court and Labor II"] by Woll, Glenn and Thatcher, then counsel for A. F. of L.: 'They [the union] could not use their right of free speech to compel an employer to violate a valid state law any more than the right of free speech could be used to compel an employer to commit arson, burglary or other recognized crime'. . . ."

■ There is no longer any doubt as to the right of a state (in a situation where questions of Taft-Hartley preemption are absent) to declare and enforce a policy against coercion by employers of employes in their choice of a collective bargaining representative. In *International Brotherhood of Teamsters* v. *Vogt, Inc.* (1957), *supra*, 354 U.S. 284, the court summarized a series of its cases which "established a broad field in which a State, in enforcing some public policy, whether of its criminal or its civil law, and whether announced by its legislature or its courts, could constitutionally enjoin peaceful picketing aimed at preventing effectuation of that policy" (p. 293 of 354 U.S.). This series of cases includes *Hughes* v. *Superior Court* (1950), *supra*, 339 U.S. 460 (which holds that the state policy can be expressed by the judiciary rather than the Legislature); *International Brotherhood of Teamsters* v. *Hanke* (1950), 339 U.S. 470 [70 S.Ct. 773, 94 L.Ed. 773, 13 A.L.R.2d 631] (which holds that a state can

enjoin picketing of a business, conducted by the owner without employes, to secure compliance with a demand to become a union shop); and *Building Service Employees* v. *Gazzam* (1950), 339 U.S. 532 [70 S.Ct. 784, 94 L.Ed. 1045] (which holds that a state can enjoin picketing, after an unsuccessful attempt at unionization and the owner's refusal to sign a contract with the union as bargaining agent, where the picketing violates state statutory policy against employer coercion of employe choice of a collective bargaining representative). The Vogt opinion (pp. 293-294 of 354 U.S.) then summarizes *Pappas* v. *Stacey* (1955), 151 Me. 36 [116 A.2d 497], appeal dismissed, *Stacey* v. *Pappas* (1955), 350 U.S. 870 [76 S.Ct. 117, 100 L.Ed. 770] (which concerned a statute substantially similar to the second paragraph of our Lab. Code, § 923), and concludes (p. 294 of 354 U.S.), "The *Stacey* case is this case. As in *Stacey*, . . . the picketing was to coerce the employer to put pressure on his employees to join the union, in violation of the declared policy of the State [the policy in Vogt was declared by Wis. Stats., § 111.06(2)(b)]. (For a declaration of similar congressional policy, see § 8 of the National Labor Relations Act, 61 Stat. 140, 29 U.S.C. § 158.) The cases discussed above all hold that, consistent with the Fourteenth Amendment, a State may enjoin such conduct."

Implementing in part the generally declared policy of Labor Code, section 923, section 1115 specifies that "A jurisdictional strike as herein defined is hereby declared to be against the public policy of the State of California and is hereby declared to be unlawful." The immediate effect of this legislation, as heretofore indicated, was to supersede the decisions of this court in such cases as *McKay* v. *Retail Auto. S. L. Union No. 1067* (1940), *supra*, 16 Cal.2d 311; *Shafer* v. *Registered Pharmacists Union* (1940), *supra*, 16 Cal.2d 379; *C. S. Smith Met. Market Co.* v. *Lyons* (1940), *supra*, 16 Cal.2d 389; and *Fortenbury* v. *Superior Court* (1940), *supra*, 16 Cal.2d 405, to whatever extent such decisions[12] enunciated or rested on a presumed state policy inconsistent with that statutorily evidenced in section 1115 and related sections. We must, therefore, as was suggested in *Garmon* v. *San Diego Bldg. Trades Council*

---

[12]We note that *Park & Tilford I. Corp.* v. *International etc. of Teamsters* (1946), 27 Cal.2d 599 [165 P.2d 891, 162 A.L.R. 1426], dealt with a related subject. But that case rested on federal rather than state law. Furthermore, it was decided before the Jurisdictional Strike Law was enacted. As a concomitant of the evolution of the law in this field the decision furnishes no impediment to the conclusions we reach today.

(1958), 49 Cal.2d 595, 607, et seq. [320 P.2d 473], in applying any of our earlier decisions, determine whether the principle on which we then rested may still be considered as controlling. (The reversal of Garmon by *San Diego Building Trades Council* v. *Garmon* (April 20, 1959), 359 U.S. 236 [79 S.Ct. 773, 3 L.Ed.2d 775], of course does not affect state labor law independent of federally preempted matters.)

Section 1117 (enacted 1947, Stats. 1947, ch. 1388, p. 2952, as amended by Stats. 1955, ch. 1417) declares that ''As used herein, 'labor organization' means any organization *or any agency or employee representation committee* or any local unit thereof in which employees participate, and exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, hours of employment or conditions of work, which labor organization is not found to be or to have been financed in whole or in part, interfered with, dominated or controlled by the employer or any employer association within one year of the commencement of any proceeding brought under this chapter. . . .

''As used herein, 'person' means any person, association, organization, partnership, corporation, unincorporated association, or *labor organization.*'' (Italics added.)

Section 1118 defines ''jurisdictional strike'' to mean ''a concerted refusal to perform work for an employer or *any other concerted interference with an employer's operation or business,* arising out of a controversy between two or more labor organizations as to which of them has or should have the exclusive right to bargain collectively with an employer on behalf of his employees or any of them or arising out of a controversy between two or more labor organizations as to which of them has or should have the exclusive right to have its members perform work for an employer.'' (Italics added.) The situation covered by this section is the situation which was dealt with by this court in *McKay* v. *Retail Auto. S. L. Union No. 1067* (1940), *supra,* 16 Cal.2d 311, 328-331. That this legislation necessarily supplants our decision in the McKay and related cases insofar as it is pertinent is obvious.

The language quoted (§ 1117) specifies that ''any agency or employee representation committee . . . in which employees participate . . . for the purpose, in whole or in part, of dealing with employers'' concerning matters of employer-employe relationship is a ''labor organization within the meaning of the Jurisdictional Strike Law so long as the agency or ''representation committee'' is not (and within the

period limited has not been) "financed in whole or in part, interfered with, dominated or controlled by the employer." Thus, any group of employes, organized or unorganized in the formal, conventional sense, who were free of the proscribed employer influence and who determined and informed their employer through their authorized spokesman that they were unwilling to accede to the demands of an organizer or unwanted union, and that they were satisfied with the terms and conditions of their employment and wished to continue in the established employe-employer relationship, would thereby act as and constitute a "labor organization" within the meaning of sections 1117 and 1118.

It is a primary rule that "courts are bound to give effect to statutes according to the usual, ordinary import of the language employed in framing them." (*In re Alpine* (1928), 203 Cal. 731, 737 [3] [265 P. 947, 58 A.L.R. 1500].) Particularly is this true when the law as so construed is consistent with the general policy of the state. As applied to the subject legislation, the meaning is that a jurisdictional strike has been shown, insofar as the *jurisdictional* feature is concerned, whenever it appears that there is a controversy between any two "labor organizations" within the definition of section 1117 "as to which of them has or should have the exclusive right to bargain collectively with an employer on behalf of his employees or any of them, or . . . as to which of them has or should have the exclusive right to have its members perform work for an employer." The statute also makes clear that a "jurisdictional strike" does not require any cessation of work but may be found to exist whenever there is "any . . . *concerted interference* with an employer's *operation or business.*" (Italics added.)

Section 1119, fitting the jurisdictional strike legislation into the policy generally enunciated in section 923, cautions that "Nothing in this chapter shall be construed to interfere with collective bargaining *subject to the prohibitions herein set forth*, nor to prohibit any individual *voluntarily* becoming or remaining a member of a labor organization, or from personally *requesting* any other individual to join a labor organization." (Italics added.) Again, it must be noticed, the Legislature carefully preserves the basic elements of collective bargaining which are declared in section 923 to be the policy of the state, including, of course, the specifically mentioned right of self-organization to that end, but makes it clear that the exercise of the right to bargain collectively is "subject

to the prohibitions herein set forth'' and that such limitations do *not* ''prohibit *any* individual *voluntarily* becoming or *remaining* a member of a labor organization, or from personally *requesting* any other individual to join'' (italics added) the organization, a right such as that which was upheld in *In re Porterfield* (1946), *supra*, 28 Cal.2d 91.

The Jurisdictional Strike Law makes clear that it is the policy of the state to avoid jurisdictional strife and, as a corollary, to protect both management and labor organizations in established employer-employe relations. Collective bargaining agreements would seem to be scarcely worth the time and effort of negotiation if the first labor organization to thereafter come along with a view to recruitment could impose concerted pressure against the employer to induce the latter to agree that he will discharge his employes unless they pay dues to the new union and accept it in place of their established organization as their sole bargaining agent. Section 923 in proscribing employer interference with the freedom of his workmen to act as they choose in labor organization matters makes no distinction between organized and unorganized workmen. The freedom of the workmen from employer influence is the same in both cases.

Pressure by a union or its organizers to compel an employer, whose employes are not organized and do not wish to be organized, to execute a closed or union shop agreement with the unauthorized union, is essentially a jurisdictional dispute pressure. The object of such pressure is not to gain *security* protection in respect to an existing collective bargaining contract or for the *employes' authorized* labor organization; rather, its objective is to secure jurisdiction over (to displace and replace through employer compulsion) an employer-employe relationship to which the union is not a party. It is clear that this type of concerted activity—this objective—is contrary to the policy of California. (Lab. Code, §§ 921-923, 1115-1122; *Garmon* v. *San Diego Bldg. Trades Council* (1958), *supra*, 49 Cal.2d 595, 606-609; *Seven Up etc. Co.* v. *Grocery etc. Union* (1953), 40 Cal.2d 368, 377-379 [254 P.2d 544, 33 A.L.R. 2d 327].) The pertinent legislation, however, makes it equally clear that, subject to the statutory restrictions which have been noted, ''Any collective bargaining agreement *between an employer and a labor organization* [i.e., as authorized by Lab. Code, §§ 921 and 923] shall be enforceable at law or in equity, and a breach of such collective bargaining agreement by any party thereto shall be subject to the same remedies, including

injunctive relief, as are available on other contracts in the courts of this State.'' (Lab. Code, § 1126; italics added.)

Further definition of the state's policy as to protection of the individual workman is encompassed in section 922 of the Labor Code. It provides that ''Any person . . . who coerces or compels any person to enter into an agreement . . . *not to join . . . any labor organization,* as a condition of securing employment or continuing in the employment of any such person is guilty of a misdemeanor.'' (Italics added.) The quoted language makes clear at least two propositions: (1) that it is unlawful to coerce any person to agree *not* to become a member of *any* labor organization as a condition for securing or continuing in employment, and (2) that requiring a workman to enter into the agreement ''as a condition of securing employment or continuing in the employment'' constitutes coercion or compulsion.

Section 1122, being *in pari materia* with sections 921 and 923 and further implementing the policy therein established, provides additional protection of the individual workman. ''Any person who organizes an employee group which is financed in whole or in part, *interfered with* or dominated or controlled *by the employer* or any employer association . . . shall be liable to suit by any person who is injured thereby.'' (Lab. Code, § 1122; italics added.) The proscription in this language extends not alone to the act of organizing an employe group *financed* by an employer but also to organizing any group of employes wherein the act of organizing such group, i.e., obtaining the consent of the employes to join in the organization, is either ''interfered with or dominated or controlled by the employer.'' Each of the quoted words must be presumed to have been used intelligently and designedly and for an express purpose by the Legislature. (*Clements* v. *T. R. Bechtel Co.* (1954), 43 Cal.2d 227, 233 [9] [273 P.2d 5]; *Read* v. *Rahm* (1884), 65 Cal. 343 [4 P. 111]; *Bakersfield etc. Co.* v. *McAlpine etc. Co.* (1938), 26 Cal.App.2d 444, 448 [2] [79 P.2d 410].) For an employer to notify his employes that he has agreed with a union which is, and which he knows to be, unauthorized and unwanted by his employes, that they must join such union and be represented by it or be dismissed from employment would appear to constitute an unlawful interference by the employer and subject him to the liability imposed by section 1122.

Industrial self-government is a goal to be desired.

Insofar as problems arise over issues which are not specifically covered by legislation they should be "solved by looking to the policy of the legislation and fashioning a remedy that will effectuate that policy." (See *Textile Workers Union* v. *Lincoln Mills* (1957), *supra*, 353 U.S. 448, 457.)

An effect to be desired is to decrease activities in the wasteful arena of economic combat and increase reliance on the orderly processes of administering collective bargaining agreements; viz., promotion of peaceful negotiation and, when necessary, arbitration or court proceedings, but not strikes, lockouts, work stoppages, mass picketing, or acts of physical or economic violence which, if not specially protected, would constitute torts or other violation of laws, state or federal.

An agreement freely negotiated and voluntarily accepted by and between a union and an employer is likely to be mutually respected and, assuming lawful objectives, can be specifically enforced through arbitration or court action, if the impelling forces of self-respect, honesty and public opinion prove insufficient. Such an agreement can scarcely be reached, and the climate for its duration will likely be unpleasant, if it is the product of coercion starting with a jurisdictional assault. And the combat is no less in truth jurisdictional where the assault is made by an organizer upon a relationship between an employer and his satisfied unorganized or self-organized employes than where the attack is on a formally organized union-employer agreement. If jurisdiction-objective raids by attacking organizers on establishments enjoying freely and fairly negotiated labor agreements are precluded and if labor and employer objectives and tactics are carefully screened, it well may be that the means of enforcement toward legitimate ends can be greatly strengthened.[13]

The constitutionality of the Jurisdictional Strike Law, hereinabove quoted and discussed, has already been established. (*Seven Up etc. Co.* v. *Grocery etc. Union* (1953), *supra*, 40 Cal.2d 368.) In that case plaintiff employer, among other things, raised the contention (which had been specifically rejected in McKay, Shafer, and C. S. Smith) that defendant unions, by concerted activity designed to force the employer to require its employes to join a particular union,

---

[13]E.g., as by contract provisions authorizing specific enforcement through arbitration of "hot cargo" agreements (see Jones, *Specific Enforcement of "Hot Cargo" Provisions in Collective Bargaining Agreements* (1959), 6 U.C.L.A. L. Rev. 85; Note (1959), 6 U.C.L.A. L. Rev. 101) or by specific performance through court action of collective bargaining agreements (*Silva* v. *Mercier* (1949), *supra*, 33 Cal.2d 704).

were seeking to compel a violation of sections 921 through 923 of the Labor Code. This court, because of its holding that defendants' activity was unlawful under the Jurisdictional Strike Law, determined that it was at that time unnecessary to consider the contention as to the true meaning of sections 921 through 923. (See pp. 371-372 of 40 Cal.2d.) Thus the proper interpretation of those sections in the light of the statutory and decisional evolution since their first consideration by this court in the McKay and related cases was expressly left open, as it also was in *Garmon* v. *San Diego Bldg. Trades Council* (1958), *supra,* 49 Cal.2d 595, 613-614, and is for the first time reexamined in the case at bar.

In the first Garmon case (*Garmon* v. *San Diego Bldg. Trades Council* (1955), 45 Cal.2d 657, 665 [13] [291 P.2d 1]) and in *Charles H. Benton, Inc. v. Painters Union* (1955), 45 Cal.2d 677, 681 [5] [291 P.2d 13], this court, without finding necessity or occasion to reconsider the construction of sections ·921 through 923 in the light of the then recently enacted *in pari materia* legislation, proceeded on the view that under state law an employer could not obtain injunctive relief from or damages for union activity designed to compel the employer to execute a closed or union shop agreement. (These decisions also antedated *International Brotherhood of Teamsters* v. *Vogt, Inc.* (1957), *supra,* 354 U.S. 284, with its comprehensive discussion of the federal court's evolution of views subsequent to its decision in *Thornhill* v. *Alabama* (1940), 310 U.S. 88 [60 S.Ct. 736, 84 L.Ed. 1093].) In Garmon defendant unions picketed and exerted secondary pressure to induce plaintiff employers to execute a union shop agreement. Plaintiffs' employes were not members of, and indicated that they did not wish to join or be represented by, a union. The evidence, it would seem, might have warranted finding that the activities come within the Jurisdictional Strike Law. But the employers' business affected interstate commerce, and the union objective and activity were unfair labor practices under the federal Labor Management Relations Act of 1947 (29 U.S.C.A. § 158). It was held (p. 666 [2b] of 45 Cal.2d) that "Concerted labor activities for such a purpose thus were unlawful under the federal statute, and for that reason were not privileged under the California law." A judgment enjoining the activities and awarding damages on the mistaken interpretation of California law and equally mistaken application of federal law was affirmed.

The United States Supreme Court granted certiorari in Garmon and, in *San Diego Bldg. Trades Council* v. *Garmon* (1957), 353 U.S. 26 [77 S.Ct. 607, 609, 1 L.Ed.2d 618], "vacated" the judgment of this court and remanded the case for proceedings not inconsistent with its opinions in that case and in *Guss* v. *Utah Labor Relations Board* (1957), 353 U.S. 1 [77 S.Ct. 598, 609, 1 L.Ed.2d 601], and *Amalgamated Meat Cutters* v. *Fairlawn Meats, Inc.* (1957), 353 U.S. 20, 23 [77 S.Ct. 604, 609, 1 L.Ed.2d 613]. The pertinent holding (as stated in the Meat Cutters case) was that "The conduct here restrained—an effort [unlawful under state policy] by a union not representing a majority of his employees to compel an employer to agree to a union shop contract—is conduct of which the National Act has taken hold. § 8(b)(2), 61 Stat. 141, 29 U.S.C. § 158(b)(2). *Garner* v. *Teamsters Union* [(1953), 346 U.S. 485, 491 (74 S.Ct. 161, 98 L.Ed. 228)], teaches that in such circumstances a State cannot afford a remedy [by injunction] parallel to that provided by the Act." In its 1957 Garmon decision the high federal court did not reach the question whether the award of damages could be upheld under *United Construction Workers* v. *Laburnum Construction Co.* (1954), 347 U.S. 656 [74 S.Ct. 833, 98 L.Ed. 1025]. It said (p. 29 of 353 U.S.), "Laburnum sustained an award of damages under state tort law for violent conduct. We cannot know that the California court would have interpreted its own state law to allow an award of damages in this different situation."

Upon the remand of Garmon a majority of this court concluded that its earlier view (enunciated in 1940 preceding both the enactment of Lab. Code, §§ 1131-1136, but see *In re Blaney* (1947), *supra*, 30 Cal.2d 643; Lab. Code, §§ 1115-1122; Lab. Code, § 1126, and the evolution of the relevant decisional law, federal and state, all as hereinabove reviewed) that the policy of California as declared in sections 921 through 923 permitted confederation between employer and an unauthorized union wherein they compacted to require unwilling employes, not members of the union, to join and maintain membership in such union, and thereby to "choose" it as their bargaining agent, on pain of dismissal from employment, had in effect, been "superseded" by the later legislation. (*Garmon* v. *San Diego Bldg. Trades Council* (1958), *supra,* 49 Cal.2d 595, 607 [5a], 613-614 [9].) We held that "The trial court correctly concluded from the evidence that by their demand the defendants sought to require the plaintiffs to interfere

with the bargaining rights of their employees and force upon them terms and conditions of their employment and labor representation not of their own choosing and which in fact they had rejected. If the plaintiffs had acceded to the demand of the defendants a definite case of coercion on the part of the plaintiffs with respect to the bargaining right of their employees, contrary to law, would have been accomplished." Therefore, this court reversed the Garmon trial court judgment insofar as it awarded injunctive relief but affirmed its award of damages.

The United States Supreme Court again granted certiorari and, in *San Diego Building Trades Council* v. *Garmon* (1959), *supra*, 359 U.S. 236 [79 S.Ct. 773, 3 L.Ed.2d 775], reversed our second Garmon judgment. It said, "When an activity is arguably subject to § 7 [setting out federally protected labor activities] or § 8 [setting out federal unfair labor practices] of the [Taft-Hartley] Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted. . . . [T]he failure of the Board to define the legal significance under the Act of a particular activity does not give the States the power to act. In the absence of the Board's clear determination that an activity is neither protected nor prohibited or of compelling precedent applied to essentially undisputed facts, it is not for this Court to decide whether such activities are subject to state jurisdiction. . . . *The governing consideration is that to allow the States to control activities that are potentially subject to federal regulation involves too great a danger of conflict with national labor policy. . . .* Since the National Labor Relations Board has not adjudicated the status of the conduct for which the State of California seeks to give a remedy in damages, and since such activity is arguably within the compass of § 7 or § 8 of the Act, the State's jurisdiction is displaced." (Italics added.)

The second United States Supreme Court Garmon decision and its predecessors, such as Garner, are disturbing because of their relation (or lack of relation) to the principles enunciated in *Yick Wo* v. *Hopkins* (1886), 118 U.S. 356, 370 [6 S.Ct. 1064, 30 L.Ed. 220] : "the fundamental rights to life, liberty, and the pursuit of happiness, considered as individual possessions, are secured by those maxims of constitutional law which are the monuments showing the victorious progress of

the race in securing to men the blessings of civilization under the reign of just and equal laws.'' Fourteenth Amendment equal protection precludes local administration of an ordinance, enacted under the police power, to arbitrarily forbid the conduct of a business because the businessman is Chinese. But apparently Fifth Amendment due process does not preclude interpretation by the high federal court of an act of Congress, enacted under the commerce power, and administration of the act by a federal board, to permit unlawful destruction of a business because the businessman is small. In the former (Yick Wo) situation destruction of the business by local government action (denial of a license) was not permitted; in the latter (Garmon) situation destruction of the business is permitted by federal board action (setting up a monetary limitation upon the size of a business which the board will protect) and federal court interpretation of a federal law to preclude any state action in this area where the board will not act. The board of supervisors were not allowed to unlawfully destroy Yick Wo's laundry by arbitrarily withholding a permit, but the San Diego unions are allowed to unlawfully destroy the Garmons' lumber mill by virtue of the federal board's refusal to take jurisdiction of the controversy and the state's federally declared inability to exercise such jurisdiction. We think the distinction between government action on the one hand and government inaction on the other hand is too subtle to be appreciated by the man whose means of livelihood are taken from him. The businessman is not reassured by the fact that his business is destroyed, not because of ''an evil eye and an unequal hand'' of local authority (pp. 373-374 of 118 U.S.), but because the federal agency which has sole jurisdiction to remedy his situation rules that it is too busy to bother with him.

In many situations there remains uncertainty as to whether a state can afford relief for conduct which violates state law and also may be potentially subject to regulation under Taft-Hartley. We are told that the state cannot control peaceful activities which are ''arguably'' subject to the national board's determination that they can be federally regulated. We do not know whether a state can properly rest its regulation of or redress for conduct which is tortious under state law upon a state finding that the conduct in fact has no arguable relation to interstate commerce or in fact is a threat to public peace or private interest in freedom from violence or intimidation. We do know that as to ''activities that are potentially subject to

federal regulation'' but which are refused such regulation because the business with which such activities are connected amounts to less than the minimum (currently announced as $500,000 a year in the case of a retail business) over which the federal agency elects to exercise its jurisdiction, there is an area of lawlessness. In this area, even though the act be tortious by state law and an unfair labor practice by federal law, the persons damaged can have no relief, either prohibitory or compensatory. They can have no relief because the federal agency refuses to act, but since potentially it *could* act, the state must *not* act. This peculiar type of segregation for justice which affords relief to the financially great but denies even a hearing to the small (less than $500,000 a year in the case of a retail) businessman does not commend itself to us. Until we are advised to the contrary we shall not enlarge the lawless area by assuming that a state cannot control unlawful conduct where, upon conflicting evidence, it finds as a fact that the conduct has no arguable effect on interstate commerce or has a potential of violence.

As we have pointed out, however, the federal Garmon decisions do not affect disposition of the case at bar, for it does not appear that the subject activities have even an arguable relation to interstate commerce. Our conclusions in the present case, furthermore, are independent of, and do not rest on, our second Garmon decision, *supra*, 49 Cal.2d 595.

The limited effect, in any event, of the second Garmon decision of this court upon the statutory and decisional rules of this state is apparent not only from the court's treatment therein of the McKay and related cases but from its express statement. The opinion in the subject Garmon decision (pp. 612-613 of 49 Cal.2d) points out that ''we are requested to reconsider'' McKay, but concludes that such reconsideration is unnecessary ''for the reason that the result sought by the request has already been accomplished'' by enactment of the Jurisdictional Strike Law which made the activities of defendants in McKay unlawful (assuming that plaintiffs there did not comprise an employer dominated or ''interfered with'' union), by the decision in *Seven Up etc. Co.* v. *Grocery etc. Union* (1953), *supra*, 40 Cal.2d 368, which upheld the constitutionality of that act, and by the decision in *International Brotherhood of Teamsters* v. *Vogt, Inc.* (1957), *supra*, 354 U.S. 284, 294, *that where interstate commerce is not involved* a state can enjoin picketing to coerce an employer to put pressure on his employes to join a union. It was unnecessary to, and this

court did not undertake to, discuss the many other California cases (including those hereinabove summarized) which uphold the general legality of the union shop agreement with appropriate security covenants. Rather, it is concluded (p. 614 of 49 Cal.2d) that ''Whether they are or are not consistent with present law may . . . be more appropriately pointed out as questions with reference thereto are presented.''

From the preceding discussion it appears that section 923, by its terms in context with the *in pari materia* statutes, recognizes and encourages collective bargaining contracts which result from ''voluntary agreement between employer and employees''[14] but forbids an employer (whether acting alone or in concert with an unauthorized union or organizer who has not been chosen by a majority of the freely participating workmen he seeks to represent) from coercing his unwilling employes to accept a particular union or person as their bargaining agent. If it is unlawful for the employer to so coerce his employes it must also be unlawful for him to agree that he will coerce them to that end. Mistakenly calling such a compact a ''union security'' agreement does not alter its character. On the other hand, where the employes of a shop or a craft, through their lawfully designated representative, negotiate for union security within any limits not barred by law, the objective is proper and can be attained and enforced.

Again, we emphasize, we are not now concerned with defining the validity or the reach of legislation insofar as in some particular application not now before us it might be urged to unlawfully curtail the freedom of competent parties to contract for lawful objectives. Such issues may be resolved when they arise.

From the diverse issues as to labor matters in the many cases which have come before the courts of this state it has appeared that California could well further implement her

---

[14]It should be noted that where an organization which has been fairly selected by the majority vote of all the employes of an employer (or of an affected craft or group) seeks union security, the organization acting for all such employes may use lawful forms of pressure (e.g., the strike, picketing, etc.) to induce the employer to grant that condition of labor. From what has hereinabove been said in the discussion of sections 921 and 923 it is obvious that the freedom declared is the freedom from employer interference in such matters as association, organization and selection of representatives, to the end that through the democratically chosen representatives collective bargaining agreements may be negotiated. The workmen, having had the opportunity to freely participate in such procedures, are, of course, bound by the majority vote, and the contract negotiated will be the contract of all.

generally sound and beneficial labor-management laws by spelling out regulations and procedures whereby employes might be assured that without fear of reprisal they may exercise the full freedoms essential to self-determination as workmen in a democracy, with free participation in determining the policies of their union and confidence in the integrity of their officers, and whereby also the many honest and able leaders in labor's activities may be better protected in their work, in the confidence of the men they serve and of the public at large, to the ultimate benefit of all concerned. It is to the honor of the many capable and upright pioneers and builders of labor's organizations that they have accomplished so much for so many with so little of scandal, but those regrettable defections which have occurred have injured not only the workmen directly affected but also inevitably to some extent all of the workmen and all of the officers who are the labor unions of America. The workmen as individuals and their unions and officers would seem to deserve some better protection in the subject areas than the law now gives them, not that the state should become officious in union affairs but that it should more adequately aid and protect labor in the conduct of its own business.

Although the Legislature has not stated what procedures as to the attainment of union designation or authorization can or shall be followed by a union which represents some but not all of the employes of an employer, who may or may not desire union representation, it has unequivocally declared a general policy favoring the right of voluntary organization and voluntary security measures and forbidding coercion or compulsion of employes by employers in the choosing of representatives.

The ordinance here under consideration does not properly regulate these last mentioned matters which the Legislature has left unregulated. Rather, it attempts to cut across the legislatively declared state-wide policy as to the full freedom of employes for self-organization and for voluntarily selecting, and negotiating agreements through, their own employe committees or agencies. The ordinance contravenes that policy as to voluntary self-organization and authorized negotiations for union security and partially duplicates that policy insofar as it prohibits jurisdictional-organizational assaults on unwilling employe-employer relationships. The ordinance sweepingly prohibits (in § 3) "*any* agreement . . . which excludes *any* person from employment because of non-

membership in a labor organization'' (italics added), and makes any injury resulting from any violation of such prohibition remediable by injunction (with possible ensuing punishment for contempt) as well as by damages. Its conflict with the terms and the reach of the hereinabove discussed statutes of this state as we construe and apply those statutes today cannot be eliminated by mechanical separation of its language. Therefore, the ordinance must be declared invalid in its entirety. (See *In re Blaney* (1947), *supra,* 30 Cal.2d 643, 653-656 [4].)

There remains to be determined what character of relief, if any, may be afforded in this action under existing law. ■ In our determination of the question whether the complaint states a cause of action for the legislatively denounced tort of coercing an employer to compel his employes to join and be represented by a labor organization not selected by the employes (Lab. Code, §§ 920-923, 1115-1122, as explained *ante*), or a cause of action for any other tort, we apply the familiar rule that ''In the construction of a pleading, for the purpose of determining its effect, its allegations must be liberally construed, with a view to substantial justice between the parties'' (Code Civ. Proc., § 452). ■ From the complaint as hereinabove summarized it appears that a majority of plaintiff's employes, as members of defendant union, authorize and support its demands for execution of the collective agreement. The crucial fact as to the legality of the demand by defendants that plaintiff execute the union shop agreement desired by plaintiff, defendants, and a majority of plaintiff's employes, is pointed up by the averment that the contract is to be one ''providing, *as permitted by the NLRA (Taft-Hartley)*, for union membership after 30 days employment.'' (Italics added.) This allegation combines with all other pertinent averments to make it clear that plaintiff is not being asked to interfere with the free choice of his employes in the selection of their bargaining agent. He is being asked to sign only an agreement of which both he and a majority of his employes approve. Whether each and all of the terms of the subject compact have been heretofore tentatively settled upon and nothing is left to be done but the signing, or whether some items remain to be negotiated, is immaterial. This is immaterial because the only fair construction of the facts pleaded is that in either event the contract to be executed will be one negotiated by a bargaining agent voluntarily selected and thereunto authorized by a majority of plaintiff's employes acting with complete freedom from employer interference.

 Obviously the *procedures* prerequisite to execution of this contract have not been and need not be precisely the same as the procedures required by Taft-Hartley.[15] The contract cannot be attained under the national act because the National Labor Relations Board cannot take jurisdiction of this intrastate matter. It cannot be arrived at by California statutorily prescribed procedures similar in all details to Taft-Hartley because California has no such detailed legislation.[16] But the essence of the allegation concerning Taft-Hartley, as we understand it in context, is that the union shop contract which the parties here wish to execute was (or will be) negotiated and agreed upon by plaintiff employer and defendant union only after all plaintiff's employes to be covered by the agreement had (or shall have had) the opportunity, free from interference by plaintiff, to participate in choosing (or in rejecting) the union as their collective bargaining representative authorized to negotiate for legitimate terms and conditions of employment, and after a majority of the employes had (or shall have) so selected and authorized the union. This, fundamentally, is "as permitted by the NLRA (Taft-Hartley)" and is precisely as authorized by Labor Code, section 923.

Inasmuch as defendants' objective—a lawfully negotiated union shop contract—is proper, and the means by which they

[15]The federal statute (National Labor Relations [Wagner] Act, 1935, 49 Stat. 449, as amended by Labor Management Relations [Taft-Hartley] Act, 1947, 61 Stat. 136; 29 U.S.C.A. § 141 et seq. [§§ 8 and 9 of the act are §§ 158 and 159 of 29 U.S.C.A.]) provides the following conditions under which a union shop contract may be attained:

The labor organization must be the collective bargaining representative designated or selected by a majority of employes in an appropriate bargaining unit; there is no particular statutory procedure prescribed for this selection or designation (except where there are controversies concerning representation or recognition, in which cases the procedure is set forth in § 9(c)); the representative selected by the majority is the exclusive collective bargaining representative of all the employes in the unit. (§§ 8(a)(3)(i), 9(a).) The National Labor Relations Board decides what bargaining unit is appropriate. (§§ 8(a)(3)(i), 9 (b).) The union must have filed copies of its constitution and bylaws and certain reports with the Secretary of Labor and filed non-Communist affidavits with the board. (§§ 8(a)(3)(i), 9(f), (g), (h).)

[16]The want of any governmentally prescribed procedure by which the affected employes will be assured of a free vote (without fear of reprisal) to determine whether a particular union is to be their representative should not preclude the parties themselves from arranging for such an election. *Labor organizations could well take the lead in this as they have* in so many advances for the welfare of workmen. Plaintiff employer here resisted the demands of defendants for a union security compact not because of hostility to the union or to union security but because compliance with those demands would have violated the ordinance. From

seek such objective are lawful,[17] plaintiff has no cause of action.

For the reasons above stated, the judgment is affirmed.

Shenk, J., and Spence, J., concurred.

McCOMB, J.—I concur in the judgment in this case; also in the careful and accurate reasoning of Mr. Justice Schauer in support of the judgment.

---

our decision he now learns that the ordinance is invalid and no legal impediment to execution of the contract appears. But in the interest of orderly and fair procedures, and the avoidance of disputes following execution of union security contracts, the following matters merit mention.

Plaintiff's employes are not parties to this litigation. Plaintiff, or some other employer in a similar situation, before entering into any union security compact, might wish some assurance that a majority of his employes do in fact desire to be represented by the union; i.e., assurance that he will not commit the tort of forcing a union shop upon an unwilling majority of employes if he agrees to a union security contract. Surely the employer's mere furnishing to his employes of the opportunity to hold an election (preferably equally participated in and supervised by the union) would not be interference with their rights of self-organization and selection of their bargaining representative, or interference with or undue support of the union.

[17]The allegation that defendants "persist in demanding he [plaintiff] sign a union contract" avers, at the most, conduct which the Restatement (4 Rest., Torts (1939), § 779), in its chapter on "Labor Disputes," calls "fair persuasion"; i.e., exhortation without threat of physical harm or economic loss, molestation or harassment (mere persistence is not necessarily harassment), or material and fraudulent misrepresentations. Obviously these means, which can lawfully be used (for a proper object) against the employer's own employes, and against third persons, to induce them to refrain from working for or dealing with the employer (see id., §§ 798-801), can lawfully be used directly against the employer.

The refusal of union men to work with non-union men is a traditional weapon of organized labor. Such concerted refusal might, in some circumstances, violate the Jurisdictional Strike Law (Lab. Code, §§ 1115-1122) but those circumstances are not shown here.

The allegation that "members of Local 1157 are conspiring to have non-union painters join the said union and they persist in refusing to work with non-union painters" does not in its context suggest any improper activity directed against plaintiff. It has been said that "conspiracy" is "a word which imports illegality" (*Pierce* v. *Stablemen's Union* (1909), *supra*, 156 Cal. 70, 75) but the bare word is a mere conclusion and, without supporting facts showing illegality, does not allege unlawful coercion (see *McKay* v. *Retail Auto. S. L. Union No. 1067* (1940), *supra*, 16 Cal.2d 311, 325 [11]). As used in the complaint here the subject allegation appears, at most, to constitute an attempt to plead a violation of section 6 of the subject ordinance, which provides that "Any combination or conspiracy by two or more persons to cause the discharge of any person . . . because he is not a member of a labor organization, by inducing or attempting to induce any other person to refuse to work with such person, shall be illegal." Since the ordinance is void a violation of its terms is immaterial.

In addition, it is my view that the field has been occupied by the people of the United States when they adopted the Constitution of the United States and by the people of the State of California by the adoption of the Constitution of this state.

The right to contract is a natural and inalienable right protected by both the federal and state Constitutions. The citizen's rights of liberty, property, and the pursuit of happiness, which are protected by the United States Constitution and the California Constitution, apply as fully to his right to contract, unlimited by unnecessary regulation, as they do to the individual's freedom from arrest or restraint of person. This liberty of contract, which includes contracts to work, contracts to employ, and liberty freely to make such contracts, means freedom from arbitrary restraint, subject only to reasonable regulation to safeguard the public interest.

The power to restrict the right of private contract is strictly limited to police regulations in behalf of the public health, safety, morals and welfare. The Legislature may not limit parties in their power to incorporate in their contracts, otherwise valid, such terms as may be mutually satisfactory to them. Nor does the Legislature have the power to impose regulations which infringe upon the constitutional rights of the parties making the contract.

The foregoing principles have been recognized in a long line of decisions by the Supreme Court of the United States, the Supreme Court of California, and numerous other courts of last resort. See cases cited in 16 C.J.S. (1956) Constitutional Law, § 210, p. 1065 et seq.; 11 Am.Jur. (1937) Constitutional Law, § 339, p. 1153, § 344, p. 1168.

The following excerpts are just a few which support the principles above announced and they illustrate that the federal and state Constitutions have completely occupied the field of freedom of contract, guaranteeing to citizens the broadest liberty in entering into contracts which are mutually satisfactory to them.

In *Allgeyer* v. *Louisiana,* 165 U.S. 578 [17 S.Ct. 427, 41 L.Ed. 832], the Supreme Court of the United States in discussing the right of the State of Louisiana to limit the issuance of marine insurance policies to companies authorized to do business in that state said at page 589: ''As so construed we think the statute is a violation of the Fourteenth Amendment of the Federal Constitution, in that it deprives the defendants of their liberty without due process of law. . . . The liberty

mentioned in that amendment means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned.''

In *Twin City Co.* v. *Harding Glass Co.,* 283 U.S. 353, at page 356 [51 S.Ct. 476, 75 L.Ed. 1112, 83 A.L.R. 1168], the Supreme Court of the United States said: ''The general rule is that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts.''

In *New Method Laundry Co.* v. *MacCann,* 174 Cal. 26 [161 P. 990, Ann.Cas. 1918C 1022], which granted an injunction restraining a former employee of a laundry from soliciting business from customers whose names appeared on the laundry's list of customers, but not from receiving laundry work from customers of his former employer tendered him without solicitation on his part, the court said at page 32: ''To restrain a person lawfully engaged in a laundry business from receiving unlaundered goods from certain former patrons is to sanction, to that extent, the establishment of a trade blacklist, thereby depriving such patrons, without any fault on their part, of the right to have their laundry work done where they will. The constitutional guaranties of liberty include the privilege of every citizen to freely select those tradesmen to whom he may desire to extend his patronage, and equity cannot invade or take away this right, either directly or indirectly.''

In *Snell* v. *Bradbury,* 139 Cal. 379, 381 [73 P. 150], this court said: ''The right to acquire, possess, and protect property includes the right to make all reasonable contracts with respect thereto, and this right is guaranteed by the constitution. The right of the 'owner is invaded, if he is not at liberty to contract with others respecting the use to which he may subject his property or the manner in which he may enjoy it.' (*Stimson Mill Co.* v. *Braun,* 136 Cal. 125 [68 P. 481, 89 Am.St.Rep. 116, 57 L.R.A. 726].)''

In *Ex parte Dickey,* 144 Cal. 234 [77 P. 924, 103 Am.St. Rep. 82, 1 Ann.Cas 428, 66 L.R.A. 928], involving a statute limiting the compensation of employment agents, this court

said at page 237, quoting from *Holden* v. *Hardy*, 169 U.S. 366 [18 S.Ct. 383, 42 L.Ed. 780] : " 'As the possession of property, of which a person cannot be deprived, doubtless implies that such property may be acquired, it is safe to say that a state of law which undertakes to deprive any class of persons of the general power to acquire property would also be obnoxious to the same provision (due process of law). Indeed, we may go a step further, and say that, as property can only be legally acquired as between living persons by contract, a general prohibition against entering into contracts with respect to property, or having as their object the acquisition of property, would be equally invalid.' "

In the same case, at page 238, the court said: "This right of contract common to the followers of all legitimate vocations is an asset of the petitioner in his chosen occupation, and, as has been said, is a part of the property in the enjoyment of which he is guaranteed protection by the constitution."

In *Ex Parte Hayden*, 147 Cal. 649, 650 [82 P. 315, 109 Am. St.Rep. 183, 1 L.R.A. N.S. 184], we stated: "It has come to be well recognized that the liberty and the pursuit of happiness in which the individual is protected by the constitution of the United States and of the state applies as fully to his right of contract, his right to follow a legitimate vocation, untrammeled by unnecessary regulations, as it does to the freedom from arrest or restraint of his person. . . .

"Putting out of contemplation, therefore, the fundamental right of the government to subject private property to taxation and to take such property in time of public calamity and peril, the right of the state to impose burdens upon such property where the business is legitimate and innocuous,—in other words, to regulate harmless vocations,—is found in the police power alone."

In *Ex Parte Drexel*, 147 Cal. 763, 764 [82 P. 429, 3 Ann.Cas. 878, 2 L.R.A. N.S. 588], it was stated: "The liberty mentioned is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling, and for that purpose to enter into all contracts which may be proper, necessary, and essential, to his carrying out to a successful conclusion the purpose above mentioned. . . . And the court further declare that a statute prohibiting, regulating, or interfering with private business can be upheld only under the police power, and that the police power can be rightfully exercised only when the statute in

question is for the protection of the public safety, the public health, or the public morals.''

On page 767 of the same case it was said: ''The law, therefore, being settled that the legislature cannot prohibit or seriously interfere with the right of the citizen to make harmless contracts touching the acquisition, protection, management, and enjoyment of property,—contracts which do not wrongfully affect the lawful rights of others or the public safety, health, or morals,—the remaining question in these cases at bar is whether trading-stamps or coupons constitute contracts which are outside the protection of the constitutional principles above declared.''

In *Stimson Mill Co.* v. *Braun*, 136 Cal. 122, 125 [68 P. 481, 89 Am.St.Rep. 116, 57 L.R.A. 726], it is stated: ''The right of property antedates all constitutions, and the individual's protection in the enjoyment of this right is one of the chief objects of society. He has the right to enjoy his property and improve the same according to his own desires in any way consistent with the rights of others, subject only to the just demands of the state. This right is invaded if he is not at liberty to contract with others respecting the use to which he may subject his property, or the manner in which he may enjoy it. The legislature may prescribe the form in` which contracts shall be executed in order that they may be valid or binding, but it cannot limit the right of parties to incorporate into their contracts respecting property, otherwise valid, such terms as may be mutually satisfactory to them. A statute declaring invalid any contract by the owner of real property, for the construction of a building thereon, unless it is provided therein that the contract price shall be payable only in money, is unconstitutional in that it is an infringement upon the right of the owner in the possession and enjoyment of his property.''

In *Gibbs* v. *Tally*, 133 Cal. 373, 377 [65 P. 970, 60 L.R.A. 815], this court said: ''It is also an unreasonable and unnecessary restriction upon the power to make contracts. (Citations.) It clearly contravenes the provisions of section 1 of article I of the constitution of the state, and the fourteenth amendment to the constitution of the United States. It is not—and clearly it could not be—contended that this law is a regulation which comes within what is called the police power.''

In *Ex Parte Quarg*, 149 Cal. 79, 80 [84 P. 766, 117 Am.St. Rep. 115, 9 Ann.Cas. 747, 5 L.R.A. N.S. 183], appears the following: ''The constitutional guaranty securing to every

person the right of 'acquiring, possessing, and protecting property,' refers to the right to acquire and possess the absolute and unqualified title to every species of property recognized by law, with all the rights incidental thereto, and, in connection with the right of personal liberty, it includes the right to dispose of such property in such innocent manner as he pleases, and to sell it for such price as he can obtain in fair barter. Any statute which interferes with this right, except in cases where the public health, morals, or safety, or the general welfare authorizes such restriction as an exercise of the police power, is, to the extent of such interference, unconstitutional and void.''

In *Credit Bureau of San Diego* v. *Johnson,* 61 Cal.App.2d Supp. 834, 839 [142 P.2d 963], the court said: ''The right to make lawful contracts are rights enjoyed by the citizens under the protection of the Fourteenth Amendment of the Constitution of the United States. . . .

''. . . Can it be said that the Employer's Liability Act and the provisions of the state Constitution authorizing the statute were intended to abrogate the constitutional right of the parties to so contract? In approaching this problem we cannot assume that the Legislature either wilfully or ignorantly intended to violate the organic law of the United States.''

Gibson, C. J., and Traynor, J., concurred in the judgment.